**IN THE COURT OF APPEALS OF IOWA**

No. 16-1583
Filed December 6, 2017

IN RE THE MARRIAGE OF LISA A. KOSTER
AND RYAN W. KOSTER

Upon the Petition of
**LISA A. KOSTER,**
        Petitioner-Appellant,

**And Concerning**
**RYAN W. KOSTER,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Scott County, Stuart P. Werling,

Judge.


        Lisa Koster appeals the custody, visitation, property-distribution, and

spousal-support provisions of the decree dissolving her marriage to Ryan Koster.

**AFFIRMED.**


        Dennis D. Jasper, Bettendorf, for appellant.

        Jennifer M. Olsen of Olsen Law Office, Davenport, for appellee.


        Heard by Danilson, C.J., and Doyle and Mullins, JJ.

**MULLINS, Judge.**

Lisa Koster appeals the custody, visitation, property-distribution, and spousal-support provisions of the decree dissolving her marriage to Ryan Koster. She contends (1) the district court's factual findings are biased and unsupported by the evidence and, as a result, the district court erred in granting physical care of the parties' two minor children to Ryan because it assumed Lisa's repeated, but unsubstantiated, allegations that Ryan abused the children had a negative effect on the children; (2) the division of assets is inequitable; and (3) the award of alimony in the amount of $1000.00 per month for one year is inequitable.[1] Lisa requests an award of appellate attorney fees.

## I.     Background Facts and Proceedings

The parties met in late 2006 as a result of their mutual participation in a church group. They immediately started dating and were subsequently married in August 2007. At the time of trial, Lisa was thirty-four years old and Ryan thirty-nine. The parties have two children, a daughter and son, born in 2011 and 2012, respectively. At the time of trial, the children were four and five years old.

---

[1] Lisa also argues (1) the statements of the guardian ad litem at trial were subjective, speculative, and biased and therefore should not have been considered by the court and (2) the district court's visitation schedule was "outrageous" and not in the best interests of the children. Because Lisa provides us with no legal authority to support her arguments on either of these issues, we decline to consider them. *See* Iowa R. App. P. 6.903(2)(g)(3); *see also In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000) ("A broad, all encompassing argument is insufficient to identify error in cases of de novo review."); *Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996) ("[W]e will not speculate on the arguments [a party] might have made and then search for legal authority and comb the record for facts to support such arguments."); *Ingraham v. Dairyland Mut. Ins. Co.*, 215 N.W.2d 239, 240 (Iowa 1974) ("To reach the merits of this case would require us to assume a partisan role and undertake the appellant's research and advocacy. This role is one we refuse to assume.").

Ryan has obtained a bachelor's degree in management-information systems and is employed as an "IT team leader" for a manufacturer. In this position he earns an annual base salary of approximately $128,900.00 and potentially receives an annual bonus, which varies depending upon company performance. Neither party challenges the district court's imputation of a $30,000.00 bonus to Ryan. Ryan's employer allows him flexibility in his work schedule pursuant to meeting his obligations as a parent and ministering to the needs of the children.

Lisa has obtained an associate's degree in management and marketing and has "almost completed" her bachelor's degree. During the marriage, Ryan encouraged Lisa to complete her bachelor's degree but she declined to do so. It would cost Lisa approximately $9500.00 to complete her bachelor's degree. Lisa worked at a church from 2006 to 2011. In this capacity, she earned between $22,000.00 and $28,000.00 per year and received benefits. It is undisputed that, before the parties' separation, Lisa was the primary caregiver of the children. In 2011, the parties mutually agreed that Lisa would be a stay-at-home mother. Lisa's status as a stay-at-home mother continued until after the commencement of proceedings. Since the commencement of proceedings, Lisa has started her own business in which she sells clothes online from her home. The business was recently launched at the time of trial, and Lisa had yet to make any profits at that time. Obviously, Lisa's status as a self-employed individual working from home allows her flexibility in her daily schedule.

Ryan has admittedly struggled with being "rough" with the parties' son, having "spanked him in anger" in the past when it comes to discipline and related

matters. The record reveals, however, that Lisa has also used spanking as a disciplinary tool. Although Lisa accuses Ryan of physically abusing their son on a number of occasions, we find those allegations unsupported by the record and conclude Ryan's conduct does not amount to physical abuse. Lisa is an aggressive discipliner and demands strict obedience from her children. Ryan, on the other hand, is more apt to be a nurturing disciplinary authority. According to a mental-health counselor, the children have close bonds with both parents. Both children enjoy the time they are able to spend with each of the parents. The children love both parents, and both parents love the children.

Prior to April 28, 2015, Lisa had started engaging the children in "body safety" discussions and advised the children that "no one is ever supposed to touch" them in their private areas. In these discussions, Lisa did not explain to the children that it would be appropriate for Ryan to have contact with these areas when completing parental tasks, such as bathing or wiping them.

On April 28, 2015, the parties' daughter allegedly reported to Lisa that Ryan touched her inappropriately.[2] After contacting a friend, Lisa transported both children to the hospital and reported Ryan to local law enforcement and the Iowa Department of Human Services (DHS).[3] At this time, Lisa also alleged Ryan physically abused the parties' son. On April 30, upon being advised by Lisa of the allegations, the "security team" at the parties' church, which is led by Lisa's brother-in-law, posted a "security alert" poster in the church's security

---

[2] The record reveals that, at this point in time, Lisa was already in search of legal counsel to pursue "separation" from Ryan.

[3] She also advised the Federal Bureau of Investigation, and several of the parties' friends of the allegations and authorized the administration of rape test kits on both of her children.

office that stated Lisa "and the children . . . are in danger of physical harm from Ryan" and he "cannot be on the premises at the same time as Lisa" and the children. One of the pastors of the church also sent at least one email to church staff and small-group members implying that Ryan abused the children and church members should limit their contact with him and support Lisa in her ensuing legal battle.

In relation to the alleged sexual contact, Lisa submitted Ryan's computer and other electronic devices to law enforcement to have them searched for child pornography despite the fact she had never seen Ryan view the same. No child pornography was found on his devices. In August, Lisa also paid a private firm $1500.00 to forensically analyze Ryan's computer for the presence of child pornography but the result was the same. Someone also contacted Ryan's employer and reported he was viewing pornography on his work devices. The work devices were confiscated and searched but, again, nothing was found.

During the resulting DHS investigation, the daughter did state that Ryan has touched her "down there" in the past, but no information was provided that such contact was accompanied by a sexual intent on the part of Ryan or was otherwise inappropriate. The child-protective worker specifically noted in her report that, "with the manner in which Lisa reacted to [the daughter's] comments and the leading questions asked by [Lisa], it is difficult to discern if contact was sexual in nature." Ultimately, DHS found the allegations against Ryan unsubstantiated. Law enforcement also declined to pursue criminal charges.

The day after Lisa filed her initial report with DHS, she filed a petition for relief from domestic abuse alleging domestic abuse on the part of Ryan and

requested the entry of protective order restricting Ryan from contacting her and the children. A temporary protective order was entered by the district court the same day. Lisa filed a petition for dissolution of marriage approximately one week later. Therein, she requested, among other things, physical care of the children and temporary and permanent child and spousal support.

In May, Ryan moved for temporary visitation. Following a hearing on the domestic-abuse matter, the district court announced on the record its belief that Lisa's allegations of domestic abuse were "incredible and not believable" and Ryan's testimony was "far more credible." The district court subsequently awarded Ryan two one-hour supervised visits with the children per week and cancelled the temporary protective order.

In June, Lisa filed an application for, among other things, temporary child and spousal support. At a contested hearing in July, Lisa also requested an award of temporary attorney fees. Following the hearing, the court ordered Ryan to pay Lisa $1800.00 in monthly child support and $5000.00 in temporary attorney fees and to continue to pay household and other expenses during the pendency of the action but denied Lisa's request for temporary spousal support. The court also "slightly expanded" Ryan's visitation by granting unsupervised visitation in a public place for two hours every Wednesday and three hours on Saturday and Sunday.

Following a second hearing on temporary matters later in July, the district court granted the parties temporary, joint legal custody but granted Lisa physical care of the children. The court provided Ryan with temporary, unsupervised visitation every Wednesday and every other weekend and reduced his temporary

child-support obligation. In doing so, the court noted "that the credible evidence presented [did] not substantiate [Lisa's] contention that [Ryan] has sexually abused his daughter, and . . . she has not proven that [Ryan] is engaged in a pattern of physical abuse of either child." Lisa subsequently reapplied for temporary spousal support and, in August, the court ordered Ryan to pay monthly, temporary spousal support in the amount of $500.00.

The children began seeing a mental-health counselor in August. Based on her interactions with the parties and children, the counselor does not believe that Ryan abused the children. In fact, when the counselor asked the children about the allegations, they both denied that they occurred. The counselor noted her concern for Lisa's frequent pressing of the children on the issue of whether Ryan has abused them and opined that such is detrimental to the relationship between Ryan and the children.

In September, Lisa filed a second report of sexual abuse with DHS. DHS launched another child-protection assessment and the resulting investigative report noted a concern that Lisa "appear[ed] to coach the child." Again, DHS concluded the allegation was unsubstantiated.

In January 2016, a third report of sexual abuse was lodged with DHS. At this time, it was alleged that Ryan touched his daughter and son inappropriately during an overnight visit. Those allegations were forwarded by one of Lisa's friends. DHS conducted another child-protection assessment in relation to these allegations and ultimately concluded there was "not sufficient evidence to show that the children were sexually abused." The child-protective worker noted in his

report his concern that Lisa's instruction of the children on body safety and frequent questioning of the children may be resulting in false reports.

At the time of trial, Lisa still held the belief that Ryan physically and sexually abused both of the children and that he is a pedophile. Lisa has broadcasted this belief and the unconfirmed allegations to her friends and family as well as many individuals who attend her church. As a result, many, if not all, of the individuals with whom Lisa surrounds herself and the children are also of the opinion that Ryan is a pedophile and child molester.[4] Specifically, Lisa sent regular updates regarding the allegations and court proceedings via electronic mail to individuals on her "prayer email list." In these emails she requested the recipients to pray that the allegations against Ryan were true and that child pornography would be found on his electronic devices. She also stated several times in these emails that she does not want Ryan to have any contact whatsoever with the children. After the sexual- and physical-abuse allegations were not confirmed by DHS, Lisa continued to repeat in these emails that Ryan is a child abuser.

A four-day trial commenced on September 6, 2016. The court entered a decree dissolving the parties' marriage on September 14. The court awarded the parties joint legal custody but placed physical care of the children with Ryan. Noting its careful consideration of the factors contained in Iowa Code section

---

[4] Ryan and Lisa were members of a six-member group of friends that developed in the fall of 2013 as a result of their involvement in a larger church group. The general purpose of the small group was for the members to discuss issues in the couples' marriages as a means to resolve the same. Ryan and Lisa's sex life came to the group's attention and much criticism was directed toward Ryan.

598.41 (2015), the district court concluded "Ryan is the parent who can administer most effectively to the long-term best interests of the children and place them in an environment that will foster healthy physical and emotional lives" and, therefore, "it is in the best interests of the children that Ryan be given [physical care] with liberal visitation rights granted to Lisa, as Ryan is better able to tend to the emotional, physical, spiritual, and educational needs of the children than is Lisa" and "to promote and maintain a healthy relationship between his children and their mother." The court granted Lisa visitation every other weekend, every other Wednesday, three weeks in the summer, and on holidays and special occasions. Pursuant to the child support guidelines, Lisa was ordered to pay Ryan child support in the amount of $298.21 per month. In order to provide Lisa with funds to complete her bachelor's degree, the court also ordered Ryan to pay Lisa monthly spousal support in the amount of $1000 for twelve months.

As noted, Lisa appeals. Additional facts may be set forth below as are relevant to the issues raised on appeal.

## II. Standard of Review

Review of dissolution cases is de novo. Iowa R. App. 6.907; *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 483–84 (Iowa 2012). While we give weight to the factual findings of the district court, especially when considering the credibility of witnesses, we are not bound by them. Iowa R. App. P. 6.904(3)(g); *In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007). Because the court bases its decision on the unique facts of each case, precedent is of little value. *In re Marriage of Brown*, 776 N.W.2d 644, 647 (Iowa 2009).

### III.    Physical Care

Lisa asserts the district court erred in placing the children in Ryan's physical care.  Lisa specifically argues the district court "ignored" Iowa Code section 598.41[5] and controlling precedent and limited its analysis to its beliefs that (1) she was trying to prove Ryan to be an unfit parent because he (allegedly) physically and sexually abused one or both children and (2) Lisa and her witnesses continue to believe Ryan sexually abused the children.  She argues the court failed to consider the "approximation rule"[6] as well as the best interests of the children, consideration of which she argues would have resulted in the children being placed in her physical care.

"Physical care" involves "the right and responsibility to maintain a home for the minor child[ren] and provide for the routine care of the child[ren]."  Iowa Code § 598.1(7).  The court considers a number of factors in determining which parent should have physical care.  *See id.* § 598.41(3); *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974).  The fundamental goal in determining physical care of a child in an action for dissolution of marriage is to place the child in the care of the parent who will likely accommodate the long-range best interests of the child.  *Winter*, 223 N.W.2d at 167.  "[T]he basic framework for determining the best interest of the child" is well established.  *Hansen*, 733 N.W.2d at 696; *see*

---

[5] Lisa frequently cites to Iowa Code section 598.21 in the portions of her brief addressing the physical-care issue.  Because that section relates to orders for disposition of property, we assume she means to cite section 598.41, which concerns custody of children.

[6] Our supreme court has described this rule as follows:  "[T]he caregiving of parents in the post-divorce world should be in rough proportion to that which predated the dissolution."  *In re Marriage of Hansen*, 733 N.W.2d 683, 697 (Iowa 2007).  The rule is not determinative, but is only one of the many factors to be considered under Iowa Code section 598.41(3).  *Id.*

*generally* Iowa Code § 598.41. Generally, stability and continuity of caregiving are important considerations. *Hansen*, 733 N.W.2d at 696. Finally, "[t]he objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Id.* at 695.

We will first consider "[w]hether both parents have actively cared for the child[ren] before and since separation." Iowa Code § 598.41(3)(d); *see Hansen*, 733 N.W.2d at 696–98. It is undisputed that Lisa has been the primary caregiver to the children both before and after the parties' separation. That is not to say Ryan has been an uninvolved parent, as the record reveals Ryan, prior to the parties' separation, was an involved parent when he was not working to provide for the family. It is true that Ryan's involvement waned after the parties' separation, but this was the result of Lisa's allegations of domestic and child abuse, all of which were ultimately not confirmed, and her corresponding affirmative effort to place legal barriers between Ryan and the children. After Ryan was granted visitation, he exercised that visitation and cared for the children when they were with him. Although Lisa's historical role as the primary caregiver weighs in favor of her being granted physical care of the children, the attribute is not dispositive on the issue of physical care because "[s]uccessful parenting . . . implicates far more than a parent's ability to attend to the daily details of raising a child." *See In re Marriage of Kunkel*, 555 N.W.2d 250, 253 (Iowa Ct. App. 1996).

We will next consider whether the parties would be suitable custodians for the children. *See* Iowa Code § 598.41(3)(a). From the outset, we agree with the

district court and several professionals involved in the proceedings that Lisa's historical allegations and contemporary belief that Ryan has abused the children are not supported by the evidence. The remaining testimony reveals that Ryan is a suitable custodian for these children. Ryan maintains a nurturing approach to parenting the children, and it is clear that he possesses a long-term interest in caring for them. While Ryan has assumed a more traditional role in the family as the breadwinner, he has participated in the caregiving of the children. Lisa maintains a more strict and aggressive approach to parenting the children. As did the district court and children's mental-health counselor, we have a concern that Lisa is pressing these children on the issue of whether Ryan has abused them. The district court found that Lisa's conduct in this regard caused the children "emotional trauma" and has "infused the children with anxiety and fear." We give deference to this assessment. *See Fennelly*, 737 N.W.2d at 100. Based on our lack of concern regarding Ryan's suitability as a custodian in comparison to our concerns for Lisa's suitability as the same, we find Ryan would be the more suitable parent to have physical care of these children.

We finally consider the ability of the parties to communicate with each other regarding the children's needs and their respective abilities to support the other's relationships with the children. *See* Iowa Code § 598.41(3)(c), (e), (5)(b). The record raises absolutely no concerns for Ryan's ability to communicate with Lisa or support her relationship with the children. Ryan still loves his wife and wants her to be involved in the children's lives. In fact, Ryan has stated throughout the proceedings that he does not want a divorce. We are highly concerned, however, with Lisa's ability to communicate with Ryan about the

children and support the parent-child relationship between them. The district court made the following conclusion:

> Lisa lacks credibility as to her assertion she can support Ryan in his role as father of her children. She continues to believe he is a pedophile and that he physically and sexually abused her children, regardless of the utter lack of evidence in support of that conclusion. It is beyond the scope of reason to assume Lisa will suddenly support Ryan's relationship with their children merely because this Court grants her request for primary care when she continues to harbor the gravest concerns for the children's welfare when in the presence of their father.

Based on our de novo review of the record, we share the district court's concern for Lisa's ability to support a relationship between Ryan and the children.

Although Lisa veils her physical-care argument by stating the district court improperly failed to consider certain factors in making its physical-care determination, we note the challenge largely relates to the court's weighing of the evidence and credibility determinations, which we give deference to. Iowa R. App. P. 6.904(3)(g). In the decree, the district court expressly noted its "careful consideration" of the factors contained in section 598.41(3) and specifically addressed many of them. Further, the finder of fact "is free to believe or disbelieve any testimony as it chooses and to give weight to the evidence as in its judgment such evidence should receive." *State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993). "In fact, the very function of the [factfinder] is to sort out the evidence and 'place credibility where it belongs.'" *Id.* (quoting *State v. Blair*, 347 N.W.2d 416, 420 (Iowa 1984)).

Based on all the evidence, we conclude Ryan is the more suitable parent and is better able to communicate with Lisa and support her relationship with the children, and we find an award of physical care to Ryan "places the children in

the environment most likely to bring them to health, both physically and mentally, and to social maturity," *Hansen*, 733 N.W.2d at 695, and is in the children's best interests. *See* Iowa Code § 598.1(1) ("'Best interest of the child' includes but is not limited to the opportunity for maximum continuous physical and emotional contact possible with both parents.").

We affirm the district court's decision to place physical care of the children with Ryan.

## IV.     Property Distribution

Next, Lisa argues the property-distribution provision of the decree was "exceedingly unfair" and "further evidence of the bias demonstrated by the trial court against" her.

First, Lisa appears to complain that Ryan was awarded the premarital value of a life insurance policy, 401k, and Roth individual retirement account, despite the fact that she stipulated to Ryan being awarded the same. Based on Lisa's stipulation, the district court found this equitable, as do we. *See* Iowa Code § 598.21(5)(k).

Next, Lisa argues the district court's division of the remaining marital property was "unfair and inequitable." She complains Ryan was credited with debts that arose after the parties' separation. *See In re Marriage of Smith*, 351 N.W.2d 541, 543 (Iowa Ct. App. 1984) (holding debts arising after separation of parties is not a marital debt). Due to the alleged inequity resulting from the district court's property distribution, Lisa specifically requests that she be awarded one-half of the difference in assets that the parties received which, according to her math, amounts to $46,950.00.

Excluding the retirement accounts that were ordered on the record to be distributed by way of qualified domestic relations orders, Ryan received assets in the amount $199,437.26 and Lisa in the amount of $105,538.47. One-half of the difference of these figures, $46,949.40, roughly amounts to Lisa's request. What Lisa's calculation ignores, however, is that the district court ordered "Ryan to pay Lisa's entire attorney fees in the amount of $46,805," fashioning such as an equalization payment, as well as the remaining guardian ad litem fees in the amount of $634.00. Accounting for these figures brings Ryan's total award to $151,998.26 and Lisa's total award to $152,343.47. These figures do not include the other debts incurred by Ryan after the parties' separation. Considering Lisa's specific request and the factors contained in Iowa Code section 598.21(5), we find this distribution equitable and therefore affirm the property-distribution portion of the district court's order.

## V. Spousal Support

Lisa contends "the trial court continued its bias in awarding [spousal support] for only one year at $1,000 per month" and the spousal support "should be $2,000 per month for five years."

At trial, Lisa testified she would like to complete her bachelor's degree, it would cost her "approximately $9500 plus books," take her "about a year" to complete, and she wants Ryan to pay for it. She specifically testified to her desire to receive spousal support for three years to help her "establish a job and an income for [her]self." Recognizing Lisa's desire to finish her education, the district court found:

> [I]t is equitable that Ryan now supports Lisa in her quest to obtain a post-secondary education. . . .  Ryan shall pay Lisa . . . alimony in the amount of $1,000 per month commencing October 1 and continuing for twelve months thereafter.  This alimony award will be slightly more than the amount Lisa testified will be required to complete her college education.  That estimate amount was $9,500.  In making this award, it is assumed Lisa will be able to better support the children with a college degree.

Now, on appeal, Lisa contends her cost of future education is $44,200.00.  We find this assertion unsupported by the record.  In any event, assuming this would include post-graduate studies, Lisa specifically testified she no longer desires to pursue those endeavors, as she desired to "stick to the business."  Although our review of spousal support is de novo, "we give [the district] court considerable latitude in making this determination . . . . [and] will disturb [it] only when there has been a failure to do equity."  *In re Marriage of Anliker*, 694 N.W.2d 535, 540 (Iowa 2005).  Because the district court awarded Lisa exactly what she asked for (and then some), we find the district did not fail to do equity and affirm.  *See Jasper v. State*, 477 N.W.2d 852, 856 (Iowa 1984) (noting a litigant "cannot deliberately act so as to invite error and then object because the court has accepted the invitation").

## VI.    Appellate Attorney Fees

Finally, Lisa requests an award of appellate attorney fees.  An award of appellate attorney fees is not a matter of right but rests within this court's discretion.  *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007).  In determining whether to award attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the district court's decision on

appeal. *Id.* In consideration of these factors, we decline to award appellate attorney fees to Lisa. Costs on appeal are assessed equally between the parties.

**VII.    Conclusion**

We affirm the decree dissolving the marriage between Ryan and Lisa in its entirety.

**AFFIRMED.**